## Commonwealth *v.* Young, Appellant.

Argued January 17, 1974. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Jerome E. Furman,* with him *Anthony J. Caiazzo,* for appellant.

*David Richman,* Assistant District Attorney, with him *James J. Wilson,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, March 25, 1974:

James Young appeals from his convictions of murder in the second degree, aggravated robbery, and burglary with intent to commit a felony.[1] We reverse and grant a new trial.

The crimes with which appellant was charged grew out of the killing of Martin Snader. On November 22, 1968, at 10:40 a.m., Snader was found lying on the floor of his jewelry store with a bullet in the left side of his head. He died a few hours later.

A Philadelphia police officer on November 30, 1968, stopped the automobile appellant was driving because he thought appellant was driving too slowly. The officer testified that when asked for his driver's license, appellant responded that he did not have one. At this time, the officer, according to his testimony, spotted a revolver on the floor of appellant's automobile. He then arrested appellant for violating The Vehicle Code. Subsequently, appellant was arraigned for violating both The Vehicle Code and the Uniform Firearms Act. Appellant could not raise his $300 bail, so he was imprisoned pending trial.

The revolver seized from appellant was turned over to a firearms examiner for the Philadelphia police. His

---

[1] Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp. 1973). At the time this appeal was taken, appeals from convictions of crimes other than felonious homicide, if the convictions were received together with the conviction of felonious homicide and grew out of the same set of operative facts, were properly brought in this Court, without the necessity of Superior Court transfer.

conclusion that the bullet found in Snader's head matched bullets which he fired from the seized revolver prompted the police to interrogate appellant.

On December 2, 1968, the police obtained a "bring-up" order, signed "as best as [the district attorney's office] can decipher," by Edward J. Blake, who at the time was serving as Court Administrator of the Court of Common Pleas of Philadelphia. At 5:15 p.m. that day, three officers, acting under the authority of the "bring-up" order, transferred appellant from the detention center to the Police Administration Building.

Appellant arrived there at 6:00 p.m. Five minutes later police read appellant his Miranda[2] rights, which the Commonwealth claims appellant waived. The first questioning session lasted from 6:25 to 7:10 p.m. Appellant was then left alone. At 7:30 a polygraph examination was administered which ended at 8:48 p.m. From then until 10:30 that evening, appellant was questioned continuously by three officers. After appellant briefly used the restroom, his interrogation again commenced at 11:05. An officer present at this questioning testified that appellant made his first inculpatory statement at 12:30 a.m. Not until 1:30 a.m. were the police satisfied and appellant allowed to return to the detention center. Appellant made no written statement at this time and signed nothing.

About an hour later at 2:40 in the morning of December 3, appellant arrived at the detention center. One of the interrogating officers directed that appellant be separated from all inmates. Accordingly, appellant was placed in an "isolation cell," which had no windows, lights, blankets, or pillows. The isolation cell contained a steel block hanging from the wall which served as a bed. Appellant remained there for over thirty-two hours until 11:30 in the morning of Decem-

---

2 *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966).

ber 4. He testified that during this time he was fed a single meal.

At 11:30, appellant was retrieved from the detention center by two officers, pursuant to a second "bring-up" order. The officers informed appellant for the first time that he was under arrest for the murder of Martin Snader. Appellant was not arraigned. He was taken to be interrogated at the Police Administration Building and arrived there at approximately noon. From noon until 3:55 p.m., a formal statement was taken. All questioning terminated at 4:25 p.m. Appellant read and signed his statement.

The first official record of appellant's arrest for murder was made at 5:30 p.m., December 4, when he was "slated." Appellant was later arraigned.

Young came to trial on June 26, 1970. The jury was unable to agree on a verdict, and on July 13, a mistrial was declared. His second trial began November 3, 1971. The Commonwealth's case was built largely around appellant's December 4, 1968 statement. On November 16, 1971, the jury returned a verdict of guilty.

Appellant presents several assignments of error.[3] We hold that appellant was denied a fair trial, guaran-

---

[3] In view of our disposition of this case, we need not consider appellant's other assignments of error. They are noted briefly below.

Appellant also claims, first, that his confession was not voluntarily given as result of either the ex parte "bring-up" order or the thirty-two hour isolation period, and that therefore its introduction into evidence was constitutional error. Second, it is urged that the introduction of the confession, the revolver seized from appellant, and the expert ballistics testimony was error because the corpus delicti of each crime charged had not been established. Third, the district attorney in his closing argument deprived appellant of a fair trial, it is claimed, because he told the jury that appellant was preparing to commit a robbery when he was arrested on The Vehicle Code violation. Fourth, a police officer's hearsay declaration to the effect that another person's confession corrobo-

teed by the due process clause of the Fourteenth Amendment to the United States Constitution and article I,

rated appellant's formal statement, according to appellant, unconstitutionally abridged his right to a fair trial. Fifth, appellant argues that it was reversible error for the trial court to refuse to instruct the jury in accordance with the points for charge submitted by him. Sixth, the trial court did not fairly preside over the trial, it is asserted, because on numerous occasions he behaved as an advocate for the prosecution.

In order to understand appellant's remaining contentions it is necessary to detail the circumstances surrounding the testimony of the Commonwealth's ballistics expert. The expert testified that he fired ten bullets from the revolver seized from appellant. Although the bullet found in the victim's head was 60% destroyed, the expert compared the ten bullets he fired with the lethal bullet. Five test bullets showed some matching striations; the other five were discarded. At trial the Commonwealth produced none of the test bullets. Rather, the expert relied on four photographs, which depicted a microscopic comparison of the bullet found in the victim with a bullet fired by the expert. Each photograph portrayed roughly one-sixth of the circumference both of the test bullet and of the lethal bullet. Only a single mark on the bullets in the expert's photographs matched, and the expert testified that the pictures could all be of the same test bullet.

With regard to the ballistics testimony, appellant's first claim is that the destruction of five bullets and the refusal to introduce the other five kept by the Commonwealth was the unconstitutional suppression of evidence under the doctrine of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Next, it is argued that the expert's testimony usurped the jury's responsibility as factfinder because the expert himself stated that an average layman could view and recognize matching striations.

Also, appellant asserts that the expert's testimony should have been excluded because it was fundamentally unreliable due to the small sampling of the tests which formed the basis for the expert's opinion. Appellant lastly contends that the trial judge improperly refused appellant's attempt to impeach by showing that in an earlier case the expert had been totally discredited. In the former case, according to appellant, the expert testified that it was a simple task to drill the barrel of a starter pistol so that it could fire bullets. To prove his point the expert brought a drill to court. After forty-five minutes of the expert's unsuccessfully drilling the barrel, the court found the defendant not guilty.

section 9 of the Pennsylvania Constitution, because the trial court failed to instruct the jury with a full and adequate charge on reasonable doubt.

The defense submitted a point for charge which clearly tracked the language in the "standard and approved" charge given in *Commonwealth v. Kluska,* 333 Pa. 65, 3 A.2d 398 (1939).[4] The defense objected to the charge on reasonable doubt and directed the trial court's attention to the defense's points for charge covering reasonable doubt.[5] After rejecting the properly-submitted point for charge, the court charged the jury on reasonable doubt in the following language.

"The burden, as I say, is on the Commonwealth to prove defendants [sic] guilt, and that burden rests on the Commonwealth from the start to the finish of the case.

"Furthermore, the Commonwealth must prove the defendant's guilt and all of the factors upon which guilt may depend beyond a reasonable doubt, before you can find defendant guilty.

"Now, what is a reasonable doubt. It must arise out of the evidence and not out of any extraneous matter. It must be more than a merely possible doubt, because you can have a possible doubt about almost anything in life. And if it was the burden on the Commonwealth to remove every possible doubt which you might have about whether or not these crimes occurred, and whether or not the defendant committed those crimes, if that were the Commonwealth's burden, why, it would be an impossible burden for it to sustain.

---

[4] See text accompanying notes 8-9 infra.

[5] The Commonwealth argues that appellant did not object to the court's charge on reasonable doubt. This contention is without merit. Not only did the defense submit a proper point for charge and vigorously object at trial to the charge as given, but appellant's post-trial motions also asserted that the trial judge improperly instructed the jury on reasonable doubt.

"If you feel a reasonable doubt, as I have defined it, as to the guilt of the defendant, or as to any of the factors upon which his guilt may depend, it will be your duty to acquit him.

"If two conclusions can be reasonably drawn from the evidence, one of innocence and one of guilt, the jury must adopt the one of innocence and find the defendant not guilty."

This charge is plainly inadequate.[6] The trial judge only told the jury that reasonable doubt was not "a merely possible doubt," and that the Commonwealth did not have "to remove every possible doubt." He also told the jury that if a conclusion of both guilt and of innocence could be reached, the jury must acquit appellant. Aside from this stark narrative, the trial court gave the jury no guidance on the meaning of "beyond a reasonable doubt."[7]

It is true that this Court has never required a single standard charge on reasonable doubt. *Commonwealth v. Williams,* 432 Pa. 557, 561, 248 A.2d 301, 303 (1968). However, we also have never stated that a jury may be given a reasonable doubt charge that fails to define reasonable doubt.

Moreover, we have repeatedly placed our imprimatur on the charge expressed in *Commonwealth v. Donough,* 377 Pa. 46, 51-52, 103 A.2d 694, 697 (1954).[8]

---

[6] In its brief the Commonwealth does not argue that the trial court gave any further instruction on reasonable doubt or in fact charged the jury in accordance with *Commonwealth v. Donough,* 377 Pa. 46, 103 A.2d 694 (1954).

[7] "We have said over and over again that one of the primary duties of a trial judge is to so clarify the issues that a jury may clearly understand the questions to be resolved . . . ." *Commonwealth v. Meas,* 415 Pa. 41, 45, 202 A.2d 74, 76 (1964). See *Commonwealth v. Beach,* 438 Pa. 37, 264 A.2d 712 (1970); *Commonwealth v. Jordan,* 407 Pa. 575, 181 A.2d 310 (1962).

[8] See, e.g., *Commonwealth v. Butler,* 442 Pa. 30, 36, 272 A.2d 916, 919-20 (1971); *Commonwealth v. Williams,* 432 Pa. 557, 561-62,

"A standard and approved form of charge on this point would be: 'The defendant comes before you presumed to be innocent and the burden is upon the Commonwealth to prove his guilt beyond a reasonable doubt. A reasonable doubt cannot be a doubt fancied or conjured up in the minds of the jury to escape an unpleasant verdict; it must be an honest doubt arising out of the evidence itself, the kind of doubt that would restrain a reasonable man (or woman) from acting in a matter of importance to himself (or herself).' "

We have many times approved of the charge recommended in *Commonwealth v. Kluska,* 333 Pa. 65, 74, 3 A.2d 398, 403 (1939).[9]

"As a standard and approved form of charge, however, we are of opinion that the jury should be told either . . . that they should not condemn unless so convinced by the evidence that they would venture to act upon that conviction in matters *of the highest importance* to their own interests, or . . . that a reasonable doubt was one that would cause them to hesitate to act in any of the *important* affairs of their own lives." The ideas contained in these "standard and approved" charges are essential to a complete, accurate, and proper charge on reasonable doubt.

The Commonwealth argues that "[t]he court's instruction concerning reasonable doubt sufficiently defined that concept." Its argument jumps from the premise that no "magic words" need be used to the con-

---

248 A.2d 301, 303 (1968) ; *Commonwealth v. Burns,* 409 Pa. 619, 635, 187 A.2d 552, 560-61 (1963). For examples of the Superior Court's reliance on the *Donough* "standard and approved" reasonable doubt charge, see *Commonwealth v. Barksdale,* 219 Pa. Superior Ct. 444, 281 A.2d 703 (1971) ; *Commonwealth v. Kopitsko,* 177 Pa. Superior Ct. 161, 165-66, 110 A.2d 745, 747 (1955).

[9] See cases cited note 8 supra. See also *Commonwealth v. Meas,* 415 Pa. 41, 45-46, 202 A.2d 74, 76 (1964) ; *Commonwealth v. Krick,* 164 Pa. Superior Ct. 516, 524, 67 A.2d 746, 750 (1949).

clusion that the lack of any words giving meaning to the standard of reasonable doubt is satisfactory. But the reasonable doubt standard is too fundamental to our jurisprudence to permit such a miserly reading.[10] Indeed, the United States Supreme Court has unequivocally held that the reasonable doubt standard is constitutionally compelled. *In re Winship,* 397 U.S. 358, 361-65, 90 S. Ct. 1068, 1071-73 (1970). After a lengthy discussion of the reasons in history, policy, and justice for the reasonable doubt test, the Court stated: "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 364, 90 S. Ct. at 1073. Because "adherence [to the reasonable doubt standard] does 'reflect a profound judgment about the way in which law should be enforced and justice administered,' " id. at 361-62, 90 S. Ct. at 1071 (quoting *Duncan v. Louisiana,* 391 U.S. 145, 155, 88 S. Ct. 1444, 1451 (1968)), a judgment with which this Court is in complete agreement,[11] we cannot sanction a contentless charge on reasonable doubt.

Our cases require that the jury be given a positive instruction fully and accurately defining reasonable doubt. Only in this way, can a jury fulfill its responsibility to decide the guilt or innocence of an accused. In the absence of a proper reasonable doubt charge, an accused is denied his right to a fair trial.

It is also clear that the trial judge, quite properly, recognized that his charge, as it appears in the record,

---

[10] See generally Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149, 1152-63 (1960).

[11] See *Commonwealth v. O'Neal,* 441 Pa. 17, 20 n.1, 271 A.2d 497, 499 n.1 (1970); Pa. Const. art. I, § 9.

was inadequate. In his opinion written in response to appellant's post-trial motions and filed December 18, 1972, the judge stated: "The trial judge is fully aware of the importance of properly defining 'reasonable doubt' to the jury. In Commonwealth v. Williams, 432 Pa. 557, 561 (1968) our Supreme Court said: 'We have never adopted and required a standard charge or definition of reasonable doubt', but ever since Commonwealth v. Donough, 377 Pa. 46 (1954) was decided, this trial judge has kept a Xerox copy of the Donough syllabus in the forefront of his memorandum book of jury instructions. It has been the court's invariable practice to read that portion of the syllabus [pertaining to reasonable doubt]."[12]

The trial judge's opinion demonstrates that he understood that the idea of a reasonable doubt as "the kind of doubt that would restrain a reasonable man (or woman) from acting in a matter of importance to himself (or herself)," is essential to a correct charge on reasonable doubt. He knew the prejudicial significance of omitting a version of the *Donough* or *Kluska* charges and sought by the following statement from his opinion to avoid the effect of its omission:

"Unfortunately, the transcript does not show that the court so instructed the jury [in accordance with *Donough*] on this occasion. However, the trial judge

---

[12] The trial judge in his opinion quoted the following portion of the *Donough* syllabus.

"4. A standard and approved form of charge on reasonable doubt would be: 'The defendant comes before you presumed to be innocent and the burden is upon the Commonwealth to prove his guilt beyond a reasonable doubt. A reasonable doubt cannot be a doubt fancied or conjured up in the minds of the jury to escape an unpleasant verdict; it must be an honest doubt arising out of the evidence itself, the kind of a doubt that would restrain a reasonable man (or woman) from acting in a matter of importance to himself (or herself).'"

is certain that he did so instruct and so certifies to our Supreme Court."

However, this Court is statutorily bound to regard the transcribed record as "prima facie accurate." Act of May 11, 1911, P.L. 279, § 4, 12 P.S. § 1199 (1953) ;[13] *Commonwealth v. Kulik*, 420 Pa. 111, 216 A.2d 73 (1966). Section 1199 establishes the sole procedure for correcting errors in the transcribed record of trial. Objections must be made within fifteen days of notice that the record is transcribed and will be filed, a hearing held, and "such order made regarding the [objections to the record] as shall be necessary in order to comport with the occurrences at the trial."

Here, no objections were made to the record by either party, no hearing held, and no order made. In short, no attempt was made to comply with section 1199. Rather, the trial judge in answering in his written opinion a point raised by the defense in its post-trial motions, asserted that he recalled giving a version of the *Donough* charge. In view of the explicit statutory procedure, this Court may not accept as correctly

---

[13] Section 1199 provides: "When the evidence in any case is transcribed, it shall be the duty of the official stenographer to lodge the same with the prothonotary or clerk of the court, and notify the parties interested or their counsel that the same will be duly certified and filed, so as to become part of the record, if no objections be made thereto within fifteen days after such notice. If objections be made, the matter shall be heard by the court, and such order made regarding the same as shall be necessary in order to comport with the occurrences at the trial. If no objections be made, or when, after objection, the transcript shall have been so made to comport with the occurrences at the trial, said transcript shall be duly certified by the official stenographer and by the trial judge, shall be filed of record in the case, and shall be treated as official and part of said record for the purposes of review upon appeal, and shall be considered as prima facie accurate whenever thereafter offered in evidence in the same or any other proceeding, without the necessity of calling the stenographer as a witness to prove the same." Act of May 11, 1911, P.L. 279, § 4, 12 P.S. § 1199 (1953).

reflecting what occurred at trial anything other than the original record or a record corrected in accordance with section 1199.

This interpretation of section 1199 does not break new ground. In *Commonwealth v. Kulik,* supra, we granted a new trial because "the trial judge in his own handwriting inserted the word 'not' between the words 'do' and 'have' in [one] portion of his charge [dealing with reasonable doubt]." Id. at 112, 216 A.2d at 74. This Court was of the opinion in *Kulik* "that for the proper administration of the judicial system in the Commonwealth a trial judge must strictly adhere to the procedural requirements of the Act [12 P.S. § 1199] . . . ." Id. at 113, 216 A.2d at 74.

The instant facts present an even more compelling case for reversal. Here, the trial judge did not merely insert a single word, but rather sought in his opinion to add an entirely new dimension to his charge on reasonable doubt. In *Kulik* this Court saw no reason to find prejudice resulting from a non-statutorily authorized change in the transcript before granting the defendant a new trial. Young's case presents manifold prejudice: the omission of a highly significant element of the reasonable doubt charge resulted in a jury deciding appellant's guilt without any guidance on its responsibility to convict only if it found appellant guilty, as the Constitution requires, beyond a reasonable doubt.

"Appellate review has become such an integral part of our criminal procedure that it may properly be viewed as an extension of the trial itself." *Commonwealth ex rel. Neal v. Myers,* 424 Pa. 576, 579 n.3, 227 A.2d 845, 846 n.3 (1967).[14] The fundamental tool for appellate review is the official record of what occurred

---

[14] See *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S. Ct. 585, 590 (1956) (BLACK, J.) ; see also Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 453 (1963).

at trial. Only the facts that appear in this record may be considered by a court.[15] As recently as *McCaffrey v. Pittsburgh Athletic Association*, 448 Pa. 151, 293 A.2d 51 (1972), this Court held that "it is black letter law that an appellate court cannot consider anything which is not a part of the record in the case." Id. at 162, 293 A.2d at 57.[16] Consistent with our re-

---

[15] The authorities are legion. See, e.g., *Interstate Cemetery Co. Appeal*, 422 Pa. 594, 595 n.1, 222 A.2d 906, 907 n.1 (1966) ; *Killian v. Allegheny County Distribs.*, 409 Pa. 344, 349, 185 A.2d 517, 519-20 (1962) ; *Wolf v. Commonwealth*, 403 Pa. 499, 504-05, 170 A.2d 557, 561 (1961) ; *Brolasky's Estate*, 309 Pa. 30, 41, 163 A. 292, 295-96 (1932) ; *Kellerman's Estate*, 242 Pa. 3, 14, 88 A. 865, 869 (1913) ; *Walter v. Sun Fire Office*, 165 Pa. 381, 385-86, 30 A. 945, 946 (1895) ; *Central Bank of Pittsburgh v. Earley*, 113 Pa. 477, 481-82, 6 A. 236, 237-38 (1886) ; *Ohio v. Union Trust Co. of Pittsburgh*, 137 Pa. Superior Ct. 75, 87, 8 A.2d 476, 482 (1939) ; *Wible v. Shor*, 102 Pa. Superior Ct. 527, 531, 157 A. 322, 323 (1931).

Although all the cases cited involve civil litigation, any requirement that an appellate court is bound by the record facts applies a fortiori to criminal cases, where accused persons enjoy greater procedural and substantive rights.

[16] That *McCaffrey* accurately states the black letter law that an appellate court is limited in its consideration to the record facts cannot be denied. *Bughman v. Byers*, 9 Sadler 128, 12 A. 357 (Pa. 1888), presents a situation remarkably similar to the instant one. There, this Court, reversing the trial court's judgment, held: "In his certificate the learned judge says: 'The foregoing is a very inadequate and, in some respects, an incorrect report of the charge of the court. The stenographer, without any knowledge of the testimony, or maps or papers, was called in to take down the charge. A considerable portion of the explanations and instructions to the jury were given with reference to a map in evidence which was before the jury and referred to by the court during the charge.'

"We have no doubt as to the correctness of this criticism. If we had been furnished with an accurate report of the charge as delivered to the jury, it would probably appear that the instructions, as a whole, were entirely free from error; but we must take the record as we find it, and upon that we are of opinion that the plaintiff has just reason to complain of the manner in which this case was submitted to the jury." Id. at 135, 12 A. at 358.

sponsibility to view only the record facts, we cannot accept the assertions in the trial court's written opinion that any reasonable doubt instruction was given other than that which appears in the record.

Because of the impact that the reasonable doubt standard has on the ultimate resolution of a defendant's guilt or innocence, the omission of an essential portion of a charge on reasonable doubt deprived appellant of a fair trial. Accordingly, appellant is entitled to a new trial.

The judgment of sentence of the Court of Common Pleas of Philadelphia is reversed, and appellant is granted a new trial.

Mr. Chief Justice JONES dissents.